**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Edward Harold Schad, Jr. and Robert Glen Jones, Jr., <br><br> Plaintiffs, <br><br> vs. <br><br> Janice K. Brewer, et al., <br><br> Defendants. | No. CV-13-01962-PHX-ROS <br><br> <u>DEATH PENALTY CASE</u> <br><br><br> **ORDER** |

Plaintiff Edward Schad, Jr., an Arizona prisoner under sentence of death, is scheduled to be executed at 10:00 a.m. on Wednesday, October 9, 2013. He has filed a civil rights complaint under 28 U.S.C. § 1983 alleging denial of access to a full and fair clemency process, in violation of his rights under the Eighth and Fourteenth Amendments. He sought a temporary restraining order preventing the Arizona Board of Executive Clemency ("the Board") from holding a commutation hearing and enjoining his execution pending availability of a full and fair clemency process. (Doc. 1 at 3.) Plaintiff Robert Glen Jones, Jr., intervened and joined Schad in the motion for injunctive relief. Jones is scheduled to be executed at 10:00 a.m. on Wednesday, October 23, 2013. On October 1, 2013, the Court issued a short order that denied the request for a temporary restraining order and stated a

longer order would issue. This is that longer order.

## BACKGROUND

In 1985, a jury convicted Schad of first-degree murder for the 1978 strangling of 74-year-old Lorimer Grove. The trial court sentenced him to death. Details of the crime are set forth in *State v. Schad*, 788 P.2d 1162 (1989), and *State v. Schad*, 633 P.2d 366 (1981). Following unsuccessful state post-conviction-relief proceedings, Schad filed a petition for a writ of habeas corpus. This Court denied relief in September 2006, and the Court of Appeals for the Ninth Circuit ultimately affirmed. *Schad v. Ryan*, 671 F.3d 708 (9th Cir. 2011) (per curiam).

After denial of certiorari, the Arizona Supreme Court issued a warrant setting Schad's execution for March 6, 2013. The Board then scheduled a reprieve/commutation hearing for February 27, 2013. Schad asked to attend the hearing and submitted materials in support of his request for commutation. (Doc. 1, Ex. C.) On February 26, 2013, instead of issuing its mandate, the Ninth Circuit granted Schad's request for a remand to this Court for further habeas corpus proceedings. *Schad v. Ryan*, No. 07-99005, 2013 WL 791610, *3 (9th Cir. Feb. 26, 2013). The Board thereafter cancelled Schad's hearing, and the warrant of execution expired.

In June 2013, the United States Supreme Court vacated the Ninth Circuit's remand order. *Ryan v. Schad*, 133 S. Ct. 2548 (2013) (per curiam). Subsequently, the Arizona Supreme Court issued a new warrant setting Schad's execution for October 9, 2013, and the Board rescheduled Schad's commutation hearing to October 2, 2013. (Doc. 1, Ex. D.)

On September 23, 2013, Schad's federal habeas counsel wrote to each of the four current members of the Board—Brian Livingston, John "Jack" LaSota, Ellen Kirschbaum, and Donna Harris—and asked that they recuse themselves from the October 2 reprieve/commutation hearing. The letter stated that a witness had indicated to Schad's counsel that Livingston and Kirschbaum, "and possibly others, engaged in an informal conversation wherein each specifically opined that he or she would never recommend

1 clemency for Mr. Schad and expressed concern about what the Governor might think of such
2 a recommendation." (Doc. 1, Ex. A.) The letter "alleged that this conversation took place
3 shortly after the previous hearing for Mr. Schad was cancelled either in late February or early
4 March, 2013." (*Id.*) The letter further stated that because Harris had only recently been
5 appointed to the Board, she "cannot comply with the training requirements necessary to sit
6 as a voting member" at Plaintiff's impending hearing. (*Id.*) Finally, the letter alleged that
7 the Governor's office "has in the past sent letters addressed to Board Members expressing
8 displeasure with certain board members['] votes in favor of clemency" and that certain
9 members "have been summoned to meetings with members of the Governor's staff to express
10 displeasure" with their votes. (*Id.*) Schad's counsel requested that each Board member
11 respond in writing by close of business, Wednesday, September 25, 2013.

12 On September 26, 2013, Schad initiated this action by filing a civil rights complaint
13 under 28 U.S.C. § 1983. In his three-count complaint, Schad sues the following Defendants:
14 Arizona Governor Janice K. Brewer; Scott Smith, Chief of Staff to Governor Brewer; Brian
15 Livingston, Chairman and Executive Director of the Arizona Board of Executive Clemency;
16 and John LaSota, Ellen Kirschbaum, and Donna Harris, members of the Board. In Count
17 One, Schad alleges Defendants have a created a clemency process that is arbitrary and
18 capricious, in violation of the Eighth and Fourteenth Amendments. In Count Two, Schad
19 alleges Defendants' failure to comply with Arizona's open meetings law violated his rights
20 under the Eighth and Fourteenth Amendments. In Count III, Schad alleges Defendants
21 conspired to deprive "high-profile inmates" access to executive clemency, in violation of the
22 equal protection clause of the Fourteenth Amendment and, for death row inmates, the Eighth
23 Amendment. In the Prayer for Relief, Schad seeks a declaratory judgment and temporary,
24 preliminary, and permanent injunctive relief.

25 Schad attached numerous documents to his complaint, including written declarations
26 from five former Board members. In opposing the motion for temporary restraining order,
27 Defendants submitted numerous declarations from past and current Board members. Those
28

- 3 -

1 submissions are summarized as follows.

2 Duane Belcher served on the Board for twenty years and was its Chairman and Executive Directive until replaced in April 2012 after his application for reappointment was denied. In his declaration, Belcher describes a meeting in early 2012 with two members of the Governor's staff, including Defendant Smith, during which he was questioned about the board's vote to recommend clemency in two "high-profile" cases—those of William Macumber and Robert Flibotte, whose clemency applications were ultimately denied by Governor Brewer. (Doc. 1, Ex. E.) "It was [his] opinion that the Governor's office wanted Board Members who would vote the wishes of her office, rather than vote their conscience, based on the facts and circumstances of each case." (*Id.*)

Ellen Stenson served on the Board for five years until she too was replaced in April 2012 after her application for reappointment was denied. According to Stenson's declaration, during her 2012 interview for reappointment, Defendant Smith asked whether she stood by the Board's 2009 unanimous vote to recommend clemency for Macumber.[1] (Doc. 1, Ex. F.) She answered affirmatively and believes her 2009 vote "in combination with my interview response that I did not regret my 2009 vote and my indication that I would likely vote the same way, if given the chance, influenced the Governor's decision to oust me from the Board." (*Id.*)

Marilyn Wilkens served on the Board for approximately two years and was the third

---

[1] Stenson states in her declaration that in 2009 Macumber had been incarcerated for murder for over thirty years and presented to the Board "substantial" evidence of innocence. (Doc. 1, Ex. F.) She claims that Governor Brewer's rejection of his clemency application "made national news" and "generated significant criticism." (*Id.*) Stenson further states that she was unable to attend a 2012 Board meeting to consider a new application from Macumber and that the 2012 vote was split 2-2 (Duane Belcher and Jack LaSota in favor, and Ellen Kirschbaum and Marilyn Wilkens against). (*Id.*) Therefore, Macumber's 2012 application did not advance to the Governor. (*Id.*)

- 4 -

member replaced in April 2012.[2] In her declaration, Wilkens asserts that, during her 2012 interview for reappointment, Defendant Smith expressed dissatisfaction with her vote to reduce the sentence of Flibotte, a 74-year-old first-time offender who had been sentenced to prison for ninety years for possession of child pornography. (Doc. 1, Ex. G.) According to Wilkens, Defendant Smith became "agitated" and told her in a raised voice that she had "voted to let a 'sex offender' go." (*Id.*) Wilkens concludes that she was not reappointed because "the Governor's office does not want to receive clemency recommendations from Board members in high-profile cases." (*Id.*)

Melvin Thomas was appointed to the Board in April 2012 and resigned on August 5, 2013. Thomas asserts in his declaration that he was aware that "the three Board members who left before me were forced out because each one of them had recommended clemency in one or more cases that got sent up to Governor Brewer." (Doc. 1 at H.) He claims that he once saw a letter from the Governor's office to an unnamed Board member relaying the Governor's displeasure about a Board vote. (*Id.*) Thomas further claims that Jesse Hernandez, who replaced Belcher as Board Chairman in April 2012, informed Board members on more than one occasion that Governor Brewer either had been unhappy with a vote or would be unhappy if the Board voted a certain way in an upcoming case, and that Hernandez got this information from the Governor's office. Nonetheless, Thomas asserts that all of his votes while serving on the Board were dictated by his conscience and that he was unconcerned about losing his job as a result of how he voted. (*Id.*)

Jesse Hernandez served as Board Chairman from April 2012 until his resignation on August 16, 2013. In his declaration, Hernandez claims that he learned shortly after taking office that the Board "is not independent from the Governor." (Doc. 1, Ex. I.) "Not long after I was sworn in, I was called to the first of several 'come to Jesus' meetings with Scott Smith and other individuals representing Governor Brewer." (*Id.*) According to Hernandez,

---

[2] Wilkens testified that she was appointed to the Board in 2010 to fill the remainder of an existing term for which she then sought reappointment in 2012.

- 5 -

1 he was lectured about the Governor's policy to be tough on crime and was told, "We don't
2 want another Macumber or Flibotte." (*Id.*) Hernandez understood this to mean that he was
3 expected to vote against clemency in "particular kinds of cases." (*Id.*) He further asserts that
4 during his short time on the Board, "the other members understood clearly that they risked
5 losing their jobs if they voted contrary to the Governor's wishes" and that current Board
6 member Ellen Kirschbaum said, "What would the Governor think?" in response to
7 Hernandez's remark that she was "always a no" vote. (*Id.*) Finally, Hernandez claims that
8 after Schad received a stay of execution in early 2012, Hernandez overheard Kirschbaum,
9 Melvin Thomas, and (current Board chairman) Brian Livingston discuss Schad's case in the
10 break room and that "all agreed that they would not be voting for clemency in his case." (*Id.*)
11 According to Hernandez, Kirschbaum "said something similar to what she had told me
12 before: 'I could not put my name on that. What would the Governor think?'" (*Id.*)

13 In addition to these declarations from former Board members, Schad also attached two
14 letters from current Board members written in response to Schad's counsel's September 23
15 letter requesting recusal. In the first letter, John LaSota writes that he will not recuse himself
16 and denies as untrue the allegation that he has ever received a letter from the Governor's
17 office expressing displeasure with votes in favor of clemency. (Doc. 1, Ex. B.) He also
18 denies ever having been "summoned" to a meeting with any member of the Governor's staff
19 for such person to express displeasure with a Board vote. (*Id.*) And in the second letter,
20 Ellen Kirschbaum also declines to recuse herself and states that she "has no personal bias or
21 prejudice against Mr. Schad" and that her "decisions are based on a comprehensive review
22 of materials presented to me as well as all the information presented at hearings." (Doc. 6,
23 Ex. J.)

24 In response to Schad's motion for injunctive relief, Defendants proffered written
25 declarations from Defendant Board members Kirschbaum, LaSota, and Livingston stating
26 that they have not been told how to vote, that job security is not a consideration in their vote,
27 that they exercise independence in voting, and that they have not discussed Schad's case or
28

- 6 -

1 how they intend to vote. (Doc. 9, Exs. C, D, E.) Defendants also proffered a declaration
2 from former Board member Thomas, who, along with Livingston and Kirschbaum, deny that
3 they ever discussed Schad's case in the Board's breakroom or elsewhere. (Doc. 9, Ex. B, C,
4 E.) Further, Defendants have proffered a redacted state investigative report substantiating
5 nine allegations of inappropriate and unprofessional acts by former Board Chairman
6 Hernandez. (Doc. 9, Ex. A.)

7 At approximately 3:30 p.m. on Friday, September 27, Schad filed a motion for a
8 temporary restraining order and/or preliminary injunction seeking to enjoin the Board from
9 meeting on October 2. Jones thereafter intervened and joined the motion. Jones' complaint
10 contains slightly different claims for relief but the joint request for emergency injunctive
11 relief was premised solely on one claim shared by Schad and Jones: that Defendants had
12 "created a clemency process that is arbitrary, capricious and effectively denies access to
13 executive clemency for high profile Arizona inmates." (Doc. 1 at 18.) On October 1, the
14 Court held an evidentiary hearing on this claim.

15 At the evidentiary hearing, Plaintiffs called as witnesses former Board members
16 Belcher, Stenson, Wilkens, and Thomas. With the exception of a clarification from Thomas
17 concerning a "letter" explained below, each confirmed that their declarations were true and
18 accurate. In other words, the former Board members confirmed their belief that their prior
19 votes regarding clemency were a major driving force in the decision by Governor Brewer not
20 to reappoint them to the Board. The Court sees no reason to question this testimony and
21 agrees that Governor Brewer's failure to reappoint certain Board members was driven, at
22 least in part, by dissatisfaction with those members' past votes.

23 The testimony from Thomas regarding a "letter" he was shown resulted in
24 considerable confusion. During the hearing, Thomas testified that someone showed him a
25 portion of a letter on a cell phone or tablet, that he saw only a few sentences and did not
26 know to whom the letter was addressed or from whom the letter was sent, and that the person
27 who showed him the letter "implied" that it was from the Governor or her staff and that the
28

- 7 -

1 letter expressed displeasure with certain Board members for voting in favor of clemency in
2 a particular case. On October 3, 2013, Thomas clarified that the "letter" at issue was the
3 letter the Board had sent to the Governor regarding Flibotte. Schad chose not to call Board
4 Chairman Hernandez or Defendant Scott Smith as witnesses.

Defendants called as witnesses Defendant Board members Livingston, Kirschbaum, and LaSota. Each reaffirmed the statements in their declarations and denied having ever been contacted by the Governor or her staff expressing displeasure concerning a Board vote or having ever been threatened to vote a certain way. Each also testified that they vote independently and that none had prejudged Plaintiffs' clemency applications. This testimony by Livingston, Kirschbaum, and LaSota was credible. In summary, Plaintiffs did not establish: 1) the current Board members have been contacted by the Governor or her staff to express displeasure regarding a past vote; 2) the current Board members have been contacted by the Governor or her staff regarding future votes; nor 3) the current Board members have prejudged any matter.

**DISCUSSION**

**I. Standard for Temporary Restraining Order**

A temporary restraining order is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam) (citation omitted). The Ninth Circuit has adopted two tests a district court must use when deciding whether to grant a temporary restraining order.[3] *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding District Court "made an error of law" by employing only one test when denying preliminary injunction). First, a plaintiff seeking a temporary restraining order can attempt to satisfy the four-part test adopted by the Supreme Court in *Winter v.*

---

[3] A request for a temporary restraining order is analyzed under the same standards as a request for a preliminary injunction. *See Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).

- 8 -

1  *Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Under that test, a plaintiff
2  "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable
3  harm in the absence of preliminary relief, that the balance of equities tips in his favor, and
4  that an injunction is in the public interest." *Id.* at 20. If a plaintiff cannot meet the *Winter*
5  test, he may show there are "serious questions going to the merits," the balance of hardships
6  tip sharply in his favor, there is a likelihood of irreparable injury, and the injunction is in the
7  public interest. *Cottrell*, 632 F.3d at 1135. This latter "sliding scale approach" allows a
8  plaintiff to make a lesser showing of likelihood of success provided he will suffer substantial
9  harm in the absence of relief. *Id.* at 1133.

10  In the context of a capital case, the Supreme Court has emphasized that these
11  principles apply when a condemned prisoner asks a federal court to enjoin his impending
12  execution because "[f]iling an action that can proceed under § 1983 does not entitle the
13  complainant to an order staying an execution as a matter of course." *Hill v. McDonough*, 547
14  U.S. 573, 583-84 (2006). Rather, "a stay of execution is an equitable remedy" and "equity
15  must be sensitive to the State's strong interest in enforcing its criminal judgments without
16  undue interference from the federal courts." *Id.* at 584.

17  **II.     Likelihood of Success on the Merits or Questions Going to the Merits**

18  Plaintiffs' motion for temporary injunctive relief centers on a claimed right to a "fair
19  and impartial [clemency] tribunal" and the allegation that the current members of the Board
20  are impermissibly motivated by personal and political interests against voting for clemency
21  because they fear both job loss and displeasing the Governor. (Doc. 6 at 10-13.) Plaintiffs
22  have not offered sufficient evidence to support their claims.

23  In Arizona, the Governor has the power to grant reprieves, commutations, and pardons
24  for all offenses except treason and impeachment. Ariz. Const. art. 5, § 5. This power is
25  limited by the Board in that "[n]o reprieve, commutation or pardon may be granted by the
26  governor unless it has first been recommended by the board." A.R.S. § 31-402(A). The
27  Board consists of five members who are appointed by the Governor for five-year terms and

28

- 9 -

who may be removed by the Governor only for cause. A.R.S. § 31-401(A), (D), (E).

Capital prisoners have no constitutional right to clemency proceedings, *Herrera v. Collins*, 506 U.S. 390, 414 (1993), or to commutation of a sentence. *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 280 (1998) (plurality opinion); *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981). And pardon and commutation decisions are "rarely, if ever, appropriate subjects for judicial review." *Dumschat*, 452 U.S. at 464. However, a divided Supreme Court has recognized that some procedural safeguards apply to clemency proceedings. In *Woodard*, the Court addressed a procedural due process claim involving Ohio's clemency process. 523 U.S. at 272. Although four justices concluded that the Due Process Clause provides no constitutional safeguards as to clemency proceedings, a majority of the Court agreed that because death-sentenced prisoners retain some life interest until execution, "some *minimal* procedural safeguards apply to clemency proceedings." *Id.* at 289 (O'Connor, J., concurring). "Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process." *Id.*; *see also Woratzeck v. Arizona Bd. of Exec. Clemency*, 117 F.3d 400, 404 (9th Cir. 1997) (concluding that a procedural due process violation exists only if the clemency board's procedures "shock the conscience"). Justice Stevens opined that the Due Process Clause protects against the use of procedures "infected by bribery, personal or political animosity, or the deliberate fabrication of false evidence." 523 U.S. at 290-91 (Stevens, J. concurring in part and dissenting in part). He further opined that the Equal Protection Clause protects against the use of "race, religion, or political affiliation as a standard for granting or denying clemency." *Id.* at 292.

Since *Woodard*, courts have adopted a cautious approach in determining whether the "minimal procedural safeguards" applicable to clemency under *Woodard* require that a decision maker be free of bias. For example, in *Anderson v. Davis*, a capital prisoner sought to remove the Governor of California from the clemency process by asserting that Governor

Gray Davis had an alleged "blanket policy vis à vis murderers to deny all applications of executive clemency out-of-hand without exercising any judgment on the particular case or prisoner before him." 279 F.3d 674, 675 (9th Cir. 2002). The Ninth Court denied the prisoner's request for injunctive relief and a stay of execution after noting that other courts "have uniformly rejected allegations that due process is violated by a governor who adopts a general policy of not granting clemency in capital cases." *Id.* at 676. The court further observed that the prisoner had failed to present any evidence suggesting that Governor Davis was incapable of "judging a particular controversy fairly on the basis of its own circumstances," but also clarified that it was not holding that the standards applicable to decisions of judicial officers and administrative boards apply to clemency decisions. *Id.* at 676-77 & n.1.

Similarly, in *Parker v. State Bd. of Pardons and Paroles*, a capital prisoner unsuccessfully sought injunctive relief and a stay of execution based on alleged bias of the board, including that of its chairman, who several years prior allegedly stated: "No one on death row [will] ever get clemency as long as [I am] Chairman of the Board." 275 F.3d 1032, 1034 (11th Cir. 2001) (per curiam) (alteration in original). The Eleventh Circuit affirmed the district court's crediting of the chairman's testimony at a hearing that he now "has an open mind and listens to all of the clemency cases that come before him prior to voting on them." *Id.* at 1037. The court therefore declined to decide whether a "closed mind" would amount to a violation of due process. *Id.* at 1037 n.3.

In *Roll v. Carnahan*, two capital prisoners seeking to enjoin their executions argued that the Governor of Missouri could not be fair and impartial when considering clemency petitions because he was running for the United States Senate and the grant of clemency in capital cases was a campaign issue. 225 F.3d 1016, 1017 (8th Cir. 2000) (per curiam). The Eighth Circuit acknowledged the minimal due process required by *Woodard*, but rejected the challenge to the governor's objectivity because "the decision to grant or deny clemency is left to the discretion of the governor." *Id.* at 1018.

Finally, in *Bacon v. Lee*, the Supreme Court of North Carolina rejected the capital prisoners' argument that the minimal due process applicable to clemency proceedings "includes the right of an inmate seeking clemency to have his or her request reviewed by an executive possessing the level of impartiality normally required of a judge presiding over an adjudicatory proceeding." 549 S.E.2d 840, 849 (2001). There, the Governor of North Carolina had previously served as Attorney General for the state throughout part, or all, of the plaintiffs' appellate and post-conviction proceedings, and was the prosecutor in one of the cases. This, plaintiffs argued, precluded the governor from fairly considering their clemency requests and rendered him unqualified to sit as a neutral and impartial decision maker. In a lengthy opinion, the court concluded that *Woodard* did not intend "to disrupt the orderly role of the executive in discharging clemency power by making his or her background or previous life experiences a justiciable controversy" under the Due Process Clause, whether alleged on an "inherent conflict of interest" theory or an "actual bias" theory. *Id.* at 851. Instead, the court found that *Woodard* required only that state clemency procedures provide notice and an opportunity to participate in the proceedings, and that "the clemency decision, though substantively a discretionary one, is not reached by means of a procedure such as a coin toss." *Id.* at 710-11, 549 S.E.2d at 850.

Here, Plaintiffs' complaint rests primarily on two premises: (1) that they have a right to fair and impartial decision makers on the Board, and (2) that the Defendant Board members are in fact biased because of either personal animus or fear of retribution from the Governor or her staff. Plaintiffs cite no controlling authority for the first, and the evidence of the second is lacking.

Plaintiffs' motion for injunctive relief cites a plethora of cases concerning the requirement of a "fair and impartial tribunal" under the Due Process Clause. However, all involve judicial or administrative decision makers; none address clemency proceedings. This Court similarly found no cases extending the concept of a "fair and impartial tribunal" to clemency proceedings. Rather, as already noted, courts have either declined to decide the

issue or found that the minimal level of process due under *Woodard* does not include the same level of neutrality as required by the Due Process Clause in other administrative and judicial proceedings. *See, e.g.*, *Bacon*, 549 S.E.2d at 853 (holding that "clemency determinations by the Executive Branch are fundamentally different than adjudicatory proceedings within the Judicial Branch" and therefore principles of recusal developed by and for judges are inapplicable). Indeed, the Ninth Circuit has expressly declined to hold that the standards applicable to decisions of judicial officers and administrative boards apply to clemency decisions. *Anderson*, 279 F.3d at 677 n.1.

The only other authority relied on by Plaintiffs is equally unavailing. In *Young v. Hayes*, the Eighth Circuit granted a stay of execution and reinstated a capital prisoner's § 1983 complaint alleging a violation of his right to due process in clemency. 218 F.3d 850 (8th Cir. 2000). There, a supervising prosecutor had threatened to fire an employee attorney who wanted to provide information to the Governor of Missouri in support of the prisoner's clemency application. The court found that Missouri law permitted the consideration of evidence in support of clemency from any and all sources and that the defendant supervisor had "deliberately interfered with the efforts of petitioner to present evidence to the Governor." *Id.* at 853. Unlike in *Young*, where the government official threatened a witness and thereby impeded the prisoner's ability to make a case for clemency, Plaintiffs here do not contend that Defendants have deliberately interfered with their efforts to present evidence in connection with their clemency applications. Rather, Plaintiffs believe that staff working for the Governor, who has the ultimate decision to grant or deny clemency, have improperly pressured Board members to vote a certain way. The evidence, however, is to the contrary. The Board members stated under oath that they have not been pressured by the Governor to vote a certain way.

Assuming that the minimal due process applicable to clemency proceedings pursuant to *Woodard* includes access to an impartial decision maker, Plaintiffs have not demonstrated that they lack access to a fair and impartial clemency process. Defendant Board members

Livingston, Kirschbaum, and LaSota testified at the hearing that each votes independently, that each considers only the evidence and arguments of counsel in determining how to vote, that none have had contact with the Governor's office or any kind of communication from the Governor or her staff regarding how to vote in Plaintiffs' cases, and that none had yet determined how to vote on Plaintiffs' applications. In addition, Livingston and Kirschbaum, as well as former Board member Thomas, denied having a conversation about Schad's case in the Board's breakroom or elsewhere and denied stating that they would be voting against Schad. In light of the credible and consistent testimony of Livingston, Kirschbaum, LaSota, and Thomas, the Court finds insufficient evidence that the current Board members are unwilling or incapable of being objective or maintaining an open mind when they consider clemency applications.

Similarly, Plaintiffs presented evidence that several former Board members believe they were not reappointed because the Governor was "unhappy" with their votes in favor of clemency. But again, even if their impressions were accurate, this does not demonstrate that the current Board members are incapable of objectivity or are biased. Livingston, Kirschbaum, and LaSota testified that job security is not a consideration in their vote, that they have received no communications from the Governor or her staff expressing displeasure with any of their clemency recommendations, that they have never been pressured to vote in a particular manner, and that each votes independently. As LaSota referenced during his testimony, Arizona law provides for dismissal of a Board member only for "cause." A.R.S. § 31-401(E). Given this standard, the Court finds no reasonable basis to conclude that "fear of dismissal" influences how the Board members vote or otherwise impacts exercise of their clemency-related duties. Nor does it find basis to conclude that fear of not being reappointed five years out means the Board members are incapable of "judging a particular controversy fairly on the basis of its own circumstances." *Anderson v. Davis,* 279 F.3d 674, 675 (9th Cir. 2002). In short, on the only claim argued in their request for injunctive relief, Plaintiffs have not established they are likely to succeed or that there are serious questions going to the

- 14 -

merits.[4]

### III. Remaining Factors

Having failed to establish a likelihood of success or serious questions going to the merits, the remaining factors cannot be dispositive. The Court notes, however, that there is a likelihood of irreparable harm in every § 1983 action brought by a capital prisoner seeking to enjoin an impending execution. *Towery v. Brewer*, 672 F.3d 650, 661 (2012). But the State also has a "strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. at 584. And "the victims of crime have an important interest in the timely enforcement of a sentence." *Id.* Therefore, in addition to not satisfying the first requirement for obtaining injunctive relief, the remaining factors support the denial of injunctive relief.

Based on the foregoing,

**IT IS ORDERED** that Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. 6) is **DENIED**.

DATED this 4th day of October, 2013.

Roslyn O. Silver
Senior United States District Judge

---

[4] The motion for preliminary injunctive relief does not address the likelihood of success on Claims Two and Three of Schad's complaint.

- 15 -